UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| SODERHOLM SALES AND LEASING, INC.,<br><br>        Plaintiff,<br><br>   vs.<br><br>BYD MOTORS INC., JOHN DOES 1-10, JANE DOES 1-10, DOE CORPORATIONS 1-10, DOE ENTITIES 1-10,<br><br>        Defendants. | CIV. NO. 19-00160 LEK-KJM |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

       This matter came before the Court for a nonjury trial on January 19, 2021. Jeffery Miller, Esq., appeared on behalf of Plaintiff/Counterclaim Defendant Soderholm Sales and Leasing, Inc. ("Soderholm"), and Christian Adams, Esq., appeared on behalf of Defendant/Counterclaimant BYD Motors Inc. ("BYD"). Soderholm and BYD filed written closing arguments on February 19, 2021, [dkt. nos. 145, 146,] and they filed written rebuttal arguments on March 12, 2021, [dkt. nos. 147, 148]. The Court, having considered the pleadings filed herein and the testimony given at trial, including the witnesses' declarations and deposition testimony, having judged the credibility of the witnesses, having examined the exhibits admitted into evidence, and considered the arguments and representations of counsel,

makes the following Findings of Fact and Conclusions of Law ("FOFCOL"), and FINDS in favor of Soderholm as to its claim that BYD acted bad faith in connection with BYD's 2018 attempt to terminate their agreement. The amount of the award of damages to Soderholm for this claim will be determined after supplemental briefing. The Court FINDS in favor of BYD as to all of Soderholm's remaining claims. Further, the Court FINDS in favor of Soderholm as to all of BYD's counterclaims. Any finding of fact that should more properly be deemed a conclusion of law and any conclusion of law that should more properly be deemed a finding of fact shall be so construed.

## I. FINDINGS OF FACT

This action arises from the parties' disputes regarding their prior motor vehicle licensing and distributorship agreement.

### A. The Parties and the Agreement

1. Soderholm sells and leases various types of motor vehicles in the State of Hawai`i and in the Pacific Islands. Soderholm purchases these vehicles from the manufacturers that it represents. [Decl. of R. Erik Soderholm ("E. Soderholm Direct"), filed 1/11/21 (dkt. no. 123), at ¶ 5.]

a. Soderholm is a Hawai`i corporation with its principal place of business in the City and County of Honolulu. [First Amended Complaint ("Amended Complaint"), filed 6/7/19

2

(dkt. no. 20), at ¶ 1; Answer to Complaint ("Answer"), filed 11/19/19 (dkt. no. 39), at ¶ 1 (admitting Amended Complaint ¶ 1).]

       b.   Erik Soderholm and his brother started the business in 1989.  [E. Soderholm Direct at ¶ 4.]

       c.   Erik Soderholm is currently the entity's vice president, and his wife, Denise Soderholm, is its president. [Id.]

       d.   Soderholm is a licensed motor vehicle dealer, under Hawaii's Motor Vehicle Industry Licensing Act ("MVILA"), Haw. Rev. Stat. Chapter 437, in the City and County of Honolulu, the County of Hawai`i, the County of Maui, and the County of Kaua`i.  [E. Soderholm Direct at ¶ 6.]

   2.   BYD manufacturers rechargable electric batteries and electric vehicles.  [Direct Testimony/Aff. of Justin Scalzi ("Scalzi Direct"), filed 1/11/21 (dkt. no. 126), at ¶ 3.]

       a.   BYD is a limited liability company, organized under Delaware law, with its principal place of business in California.  [Answer, Counterclaim at ¶ 1; Answer to Def. BYD Motor Inc.'s Counterclaim Filed November 19, 2019 ("Counterclaim Answer"), filed 12/9/19 (dkt. no. 43), at ¶ 2 (admitting the allegations in Counterclaim ¶ 1).]

       b.   At the time of trial, Justin Scalzi ("Scalzi") was the Senior Director of Business Development on the West

Coast.  [Scalzi Direct at ¶ 1.]  From 2014 to 2018, he was the Regional Sales Manager, responsible for California, Arizona, Nevada, and New Mexico.  In 2018, he became the Director of Business Development on the West Coast, and Hawai`i was also assigned to him.  [Id. at ¶ 5.]

c.   BYD's company headquarters are in Shenzhen, China, where its affiliate company has one of its bus factories. One of BYD's bus factories is in Lancaster, California.  [Id. at ¶ 3.]

d.   BYD obtained a Hawai`i motor vehicle manufacturer license in 2017, [E. Soderholm Direct at ¶ 8,] and a Hawai`i motor vehicle dealer license in 2020, [Tr. Exh. 71 (Notice of Licensure); Scalzi Direct at ¶ 57].

3.   Soderholm and BYD – through BYD Heavy Industries, a division of BYD – entered into a Sales and Service Agreement, effective December 1, 2016 ("Agreement").  [Tr. Exh. 1 (Agreement).]

a.   Denise Soderholm signed the Agreement on behalf of Soderholm, and Macy Neshati signed it on behalf of BYD Heavy Industries.  [Id. at 16.]

b.   The Agreement was effective for one year, and was to continue thereafter, unless the Agreement was terminated according to Article VII of the Agreement.  [Id. at 3, art. III.]

c. The Agreement granted Soderholm "a non-exclusive right to (a) buy new BYD Products, and (b) identify itself as an authorized [sales and service organization ('SSO')] of BYD Products at the locations approved by BYD . . . ." [Id. at 2, art. I.] The Agreement defined "BYD Products" as "BYD Vehicles and Parts and Accessories," which were "[t]he BYD vehicle line(s) of products set forth on the Data Sheet attached [to the Agreement]" and "[n]ew or remanufactured BYD Vehicle parts and accessories marketed by BYD." [Id. at 1-2, ¶¶ 11, 13, 14.]

d. Under the Agreement, Soderholm was responsible, in Hawai`i and the Pacific Islands for: "(a) actively and effectively selling new BYD Vehicles; (b) actively and effectively promoting through SSO's own advertising and sales promotion activities, the purchase and use of new BYD Vehicles; and (c) meeting or exceeding the Sales Performance Criteria." [Id. at 7, art. V.A.8.1; id. at BYD001297, ¶ C (Data Sheet definition of "Area of Primary Responsibility").]

e. The Agreement stated:

> BYD may terminate this Agreement at any time at its election, for one of the reasons set forth in Section VII(A)(4), VII(A)(S) [sic] or VII(A)(6), or for breach or another term of this Agreement, by notice in writing given to the SSO specifying the date of termination which date will not be less than thirty (30) days after the date of said notice, or under such other circumstances as provided by law.

[Tr. Exh. 1 (Agreement) at 11, art. VII.A.2.]

5

f.   Article VII, section A.4 permits termination if the SSO fails to maintain a valid license, and section A.5 permits termination if the SSO becomes incapacitated.  [Id. at 11.]  Section A.6 permits termination "Due to Certain Acts or Events[,]" including "[f]ailure to meet sales objectives in SSO's Area of Primary Responsibility or otherwise maximize sales of BYD vehicles and products."  [Id.]

4.   Erik Soderholm negotiated the Agreement with Mr. Neshati.  [Soderholm's Designation of Depo. Testimony of Macy Neshati, filed 12/29/20 (dkt. no. 97), Exh. 1 (excerpts of trans. of Macy Neshati's 8/12/20 Zoom depo.) ("Neshati Depo. (Soderholm excerpts)") at 14:8-15:14;[1] E. Soderholm Direct at ¶¶ 9-12.]

a.   Mr. Neshati started working for BYD in January 2016, but he had known Erik Soderholm for many years prior to that from various bus industry events.  [Neshati Depo. (Soderholm excerpts) at 9:15-10:5, 10:13-24, 13:20-21; E. Soderholm Direct at ¶ 9.]

b.   Mr. Neshati asked Erik Soderholm for a sample dealer agreement, and Erik Soderholm provided him with the agreement between Soderholm and ElDorado.  The Agreement is an

---

[1] The parties stipulated to the use of certain witnesses' deposition testimony as the witnesses' trial testimony. [Stipulation Regarding the Use of Deposition Testimony in Lieu of Live Testimony, filed 1/15/21 (dkt. no. 140).]

edited version of the ElDorado agreement.  <u>See</u> E. Soderholm

Direct at ¶ 10; <u>see also</u> Tr. Exh. 1 at BYD001298 ("Dealer and

ElDorado agree . . .").

        c.   According to Erik Soderholm, when the parties

entered into the Agreement,

> BYD and Soderholm understood it would take 3-5
> years to establish BYD electric bus sales in
> Hawaii by bringing in demonstration buses for
> private and public entities, making
> presentations, writing bid specifications, and
> responding to RFPs from governmental entities.
> Soderholm knew sales of BYD motor vehicles would
> take longer than diesel and gas products it sold
> because potential customers were not familiar
> with the relatively new technology of electric
> buses and many customers lacked the necessary
> infrastructure to keep the electric motor
> vehicles sufficiently charged during their
> intended routes and uses.  Adding charging
> infrastructure was an indirect cost to purchasing
> electric motor vehicles and created an added
> hurdle for sales of BYD products.

[E. Soderholm Direct at ¶ 16.]

    5.   According to BYD, Soderholm held itself out to be the

exclusive dealer of BYD products in Hawai`i, and this was

contrary to the terms of the Agreement, which expressly stated

it was non-exclusive.  <u>See, e.g.,</u> Scalzi Direct at ¶ 35.

**B.**    <u>**Parties' Performance Under the Agreement**</u>

    6.   Soderholm purchased BYD vehicles, demonstrated and

displayed them at various events, and attempted to promote and

sell them to Soderholm's customers.

a.   In 2017, Erik Soderholm began to introduce Scalzi to his client contacts, in both the public and private sector. [E. Soderholm Direct at ¶ 18.]

1)   According to Scalzi, during these initial meetings, Erik Soderholm told Soderholm's customers, both public entities and private customers, that he would sue them if they did not buy BYD buses from Soderholm.  Erik Soderholm said he had sued others before and had never lost.  [Scalzi Direct at ¶ 12.]

2)   As an example, Scalzi cites a March 2017 presentation that he saw Erik Soderholm make for the County of Maui.  [Id. at ¶ 14.]  According to Scalzi, Don Medeiros told him "they loved [BYD's] product, but did not like or want to do business with [Soderholm], and did so only when they had to because there was no other choice."  [Id.]

3)   Erik Soderholm denies Scalzi's allegations, pointing out that such a practice would be inconsistent with Soderholm's long-standing customer relationships and that Scalzi's allegations are belied by Soderholm's continued sales to the customers Scalzi claims Erik Soderholm alienated. [E. Soderholm Direct at ¶¶ 19-20.]

4)   It is not necessary for this Court to resolve this dispute about whether Erik Soderholm threatened

potential customers because, ultimately it is irrelevant to the issues in this case.

5)   Scalzi also states that, during these initial meetings with potential Hawai`i customers, he "found out that [Soderholm] had a near monopoly in Hawaii as being one of the very few Hawaii licensed dealers who sold buses." [Scalzi Direct at ¶ 13.]

b.   On January 31, 2017, Soderholm purchased a BYD ECB 16 electric forklift for $37,125.00 and paid $7,500.00 in shipping and installation costs for the charging system. Soderholm used it in demonstrations for potential customers. [E. Soderholm Direct at ¶ 21; Tr. Exh. 65.]

c.   On February 10, 2017, Soderholm purchased a 2014 BYD e6 sport utility vehicle ("BYD SUV") for $49,500.00, and this price was not discounted in any way.  Soderholm displayed and demonstrated the BYD SUV at its 2017 Pacific Bus Expo, and Erik Soderholm drove the vehicle - with BYD decals - to give BYD exposure in Hawai`i.  [E. Soderholm Direct at ¶ 22.]

d.   Soderholm displayed and/or demonstrated BYD vehicles at the following events: Soderholm's February 2017 Pacific Bus Expo; the March 24-26, 2017 First Hawaiian Bank/Motor Trend Auto Show ("Auto Show"); Soderholm's February 26, 2018 BYD Exposition; the March 13-15, 2018 Auto Show; and various electric car shows sponsored by, *inter alia*,

Hawaiian Electric Industries, Inc. ("HEI") and Blue Planet
Foundation. [Id. at ¶¶ 22, 24, 30.]

   1) Soderholm spent more than $3,000 each year
it that displayed BYD vehicles at the Auto Show, and Soderholm's
BYD display at the 2017 Auto Show was the first time a Chinese
electric car was displayed at a major automotive showcase in the
United States. [Id. at ¶ 24.]

   2) Soderholm spent more than $8,000 to hold the
2018 BYD Exposition and invited more than 100 of Soderholm's
customers and contacts, including persons from governmental
entities. [Id. at ¶ 30, Tr. Exhs. 4, 32.]

  e. Soderholm arranged for Scalzi to make a
presentation at the 2017 Pacific Bus Expo and, after the expo,
Erik Soderholm emailed approximately a dozen of Soderholm's
clients and offered for Scalzi to make presentations to them.
[E. Soderholm Direct at ¶ 23; Tr. Exh. 3 (example of these
emails).]

  f. On August 21, 2017, Soderholm purchased four 2017
BYD SUV's for $49,500.00 each, which was not a discounted price.
Soderholm was only able to sell one, which was sold to HEI. Two
are driven by Soderholm managers. [E. Soderholm Direct at
¶ 26.]

  g. Erik Soderholm sold Kelvin Kohatsu ("Kohatsu") a
BYD e6 vehicle and, in an October 23, 2017 lunch meeting,

Kohatsu said he loved it and was interested in purchasing fifty similar vehicles. At the time, Kohatsu was the Equipment Manager for Hawaiian Electric Company ("HECO"). Erik Soderholm reported Kohatsu's interest to Scalzi. [Id. at ¶ 27; Tr. Exh. 14 at BYD006456 (10/23/17 email from Erik Soderholm to Scalzi).] Scalzi responded: "That is great! Having Kelvin on board will definitely expedite our opportunities." [Tr. Exh. 14 at BYD006455 (10/24/17 email from Scalzi to Erik Soderholm).]

      h. In early 2018, Soderholm arranged to have a demonstration 2014 BYD K9M, forty-foot, low-floor, Gen II bus ("BYD Demo Bus") shipped from the West Coast to Hawai`i for a forty-five-day test with the City and County of Honolulu, Oahu Transit Services. Erik Soderholm negotiated the lowest rate to ship the BYD Demo Bus from the West Coast through Matson, and Soderholm and BYD each paid for half of the cost. Erik Soderholm also negotiated reduced shipping fees for Young Brothers to ship the BYD Demo Bus to the County of Hawai`i, the County of Maui, and the County of Kaua`i. BYD also split those reduced shipping fees with Soderholm. According to Erik Soderholm, the purpose of showing the BYD Demo Bus to county representatives was to convince them to buy BYD vehicles because the vehicles could meet the counties' needs. [E. Soderholm Direct at ¶¶ 28-29.]

i. Soderholm initially spent $20,000.00 for the purchase and installation of a charger for the BYD buses, but Soderholm incurred additional installation costs because the instructions that BYD provided were not correct. [Id. at ¶ 28.]

7. Soderholm prepared a bid with BYD vehicles in response to the State of Hawai`i Department of Transportation, Airports Division's ("Airports Division") request for proposals ("RFP") for a multi-million-dollar contract to provide buses for the Wiki Wiki shuttle service at the Daniel K. Inouye Airport. However, a day before the deadline to submit bids, BYD instructed Soderholm not to submit the bid. Erik Soderholm states no bids were ultimately submitted, and he opines that Soderholm would have been awarded the contract if it had submitted the bid it prepared. He further opines that the contract would have likely led to more sales to the Airports Division. [Id. at ¶ 31.] This RFP was issued in 2018. See id. at ¶ 48.

a. Scalzi states that BYD decided not to proceed with the 2018 Wiki Wiki bid because the necessary modifications to the existing BYD chassis that BYD intended to use for the Wiki Wiki buses became "substantially more expensive than initially anticipated[,]" which led the Airports Division to reduce the requested quantity from eight units to two units.

[Scalzi Decl. at ¶ 60.]  The ability to meet the production
deadline was also a concern.  [Id. at ¶ 61; Tr. Exh. 36.]

   b.   Soderholm has not presented any evidence to
contradict BYD's evidence regarding BYD's decision not to
proceed with the 2018 Wiki Wiki bid.

   8.   BYD asserts that the prices Soderholm set for the BYD
vehicles that Soderholm offered were too high, putting BYD's
vehicles "out of the market," because Soderholm included markups
that were greater than what dealers usually charged.  [Scalzi
Direct at ¶¶ 18-19; Tr. Exh. 41 (5/25/17 email regarding Travel
Plaza Transportation/Japan Travel Bureau ("TPT/JTB")); Tr.
Exh. 6 (Soderholm quote for Waikiki Trolley/All Nippon Airways
("ANA"), valid until 7/31/17); Tr. Exh. 40 (6/15/17 email
regarding E`Noa Tours/Waikiki Trolley).]  BYD has not presented
any evidence that either TPT/JTB or E`Noa Tours ("E`Noa") would
have purchased the BYD vehicles at a lower price.

   9.   The parties have had a long-standing dispute regarding
whether BYD was required to utilize a licensed dealer to sell
vehicles to government entities.  See, e.g., E. Soderholm Direct
at ¶¶ 12-13, 25; Scalzi Direct at ¶¶ 13, 27.

   a.   Article IX.E of the Agreement states:

   The SSO agrees that BYD shall have the right of
   sale to public institutions and political
   subdivisions and to enter into BYD direct
   accounts, and also shall have right of sale of
   any and all Special Vehicles.  BYD is not

13

> required to pay to SSO a commission for units
> delivered in SSO's Area of Primary Responsibility
> as a result of aforementioned sales.
>
> SSO shall service all such Vehicles in accordance
> with Article V[.]

[Tr. Exh. 1 at 15.]

b.   Erik Soderholm believes this provision was virtually unenforceable because BYD, which did not have a Hawai`i dealer's license during the relevant time period, "could not solicit or offer to sell its products directly to a consumer in Hawaii without using a dealer," unless the "public entity was **known to be using** [Federal Transit Administration ('FTA')] funds for a proposed purchase."  See E. Soderholm Direct at ¶ 12 (emphasis added) (discussing his attempt to have the Article IX.E provision removed during the negotiation of the Agreement).

c.   Erik Soderholm has been selling buses in Hawai`i for more than thirty years, and, based on his experience, most of the RFP's that public entities issue for motor vehicles do not disclose the source of the funds.  Thus, when submitting its bid, the bidder would rarely know the funding source for the motor vehicle purchase described in the RFP.  [Id. at ¶ 14.]

d.   Erik Soderholm also asserts that, even where BYD could make a direct solicitation or sale because FTA funds were

being used, that did not preclude BYD from making the
solicitation or sale through Soderholm.  [Id. at ¶ 13.]

e.    In contrast, BYD's position is that government
entities have "a right of direct procurements from [original
equipment manufacturers] on projects where federal funding [i]s
involved."  Scalzi Direct at ¶ 13 (citing Tr. Exh. 63 (Soderholm
Sales & Leasing, Inc. v. Dep't of Budget & Fiscal Servs.,
No. CAAP-13-0000049, 2013 WL 6095428 (Hawai`i Ct. App. Nov. 18,
2013))); see also id. at ¶ 27 (discussing federal law).  BYD has
presented this position to government entities in Hawai`i in
support of its attempts to convince the entities to purchase BYD
vehicles.  [Scalzi Direct at ¶ 28 (citing Tr. Exh. 55 at
BYD000053).]

f.    Neshati testified that BYD wanted the
Article IX.E provision in the Agreement because BYD "wanted the
ability to work directly with the public institutions,
particularly in Honolulu," because BYD understood that those
agencies had negative opinions of Soderholm.  [BYD's Designation
of Depo. Testimony of Macy Neshati, filed 12/29/20 (dkt.
no. 104), Exh. 1 (excerpts of trans. of Macy Neshati's 8/12/20
Zoom depo.) ("Neshati Depo. (BYD excerpts)") at 19:1-20:11.]

g.    Neshati testified that, when the parties entered
into the Agreement, BYD understood that public agencies could
choose to purchase directly from BYD.  [Id. at 20:19-23.]

Neshati discussed BYD's position with Erik Soderholm, but Erik Soderholm believed that he could do a better job of selling to Hawai`i public entities than BYD could. [Id. at 21:13-20.]

h.   According to Erik Soderholm, BYD never told him not to demonstrate BYD vehicles to government entities and, in fact, encouraged him to do so. [E. Soderholm Direct at ¶ 20.]

i.   This Court finds that the parties were aware of their differing opinions about whether, and if so when, BYD could engage in direct sales to government entities.

j.   Although the Agreement reserved to BYD the right to engage in direct sales to government entities, to the extent permissible by law, the Agreement did not preclude Soderholm from acting on BYD's behalf in sales to government entities.

k.   BYD was aware of and, at times, encouraged Soderholm's attempts to sell BYD products to government entities.

10.  According to BYD "virtually all" of the relevant contact people from the potential government entity customers in Hawai`i "disliked . . . and did not wish to deal with" Soderholm. [Scalzi Direct at ¶ 30.] Scalzi describes three examples of government personnel who expressed such opinions to him. [Id. at ¶¶ 30-32.]

11.  Scalzi states Erik Soderholm's attitude toward Soderholm's customers was "offensive" and "disturbing" and

Scalzi was concerned that it "would reflect poorly on BYD."

[Id. at ¶¶ 36-38 (citing Tr. Exh. 37 at BYD003633 (page from 3/13/19 email from Erik Soderholm to Scalzi); Tr. Exh. 44 (4/6/18 email from Erik Soderholm to Scalzi)).]

12.   E`Noa has been a Soderholm customer for approximately fifteen years.  ANA Airlines is a client of E`Noa, which provides charter bus services for ANA.  [Id. at ¶¶ 32-33.]

a.   In June 2017, Erik Soderholm provided an initial quote for two BYD electric buses to Maki Kuroda ("Kuroda"), the president of E`Noa.[2]  [Id. at ¶ 32; Tr. Exhs. 6, 40.]

b.   Kuroda believed that Erik Soderholm was her contact person for BYD buses and that he was representing BYD. [Soderholm's Designation of Depo. Testimony of Maki Kuroda, filed 12/29/20 (dkt. no. 96), Exh. 1 (excerpts of trans. of Maki Kuroda's 2/28/20 depo.) ("Kuroda Depo. (Soderholm excerpts)") at 21:11-20.]

c.   In May 2018, E`Noa approached Erik Soderholm and Scalzi about the potential purchase of BYD buses for the ANA charter service.  [E. Soderholm Direct at ¶ 33; Tr. Exh. 54.]

---

[2] At the time of her deposition, Kuroda was the Chief Executive Officer/President of E`Noa.  [BYD's Designation of Depo. Testimony of Maki Kuroda, filed 12/29/20 (dkt. no. 105), Exh. 1 (excerpts of trans. of Maki Kuroda's 2/28/20 depo.) ("Kuroda Depo. (BYD excerpts)") at 10:22-11:5.]

d.   Kuroda wanted them to participate in a meeting
with ANA about the potential use of BYD buses.  Erik Soderholm
was unable to attend the meeting and arranged to have Scalzi
attend.  [E. Soderholm Direct at ¶ 33.]

e.   According to Erik Soderholm, BYD offered to sell
two BYD buses directly to E`Noa without Soderholm's knowledge or
involvement, and E`Noa accepted, subject to confirmation that
E`Noa could obtain the necessary electrical support.  [Id.; Tr.
Exh. 8 (BYD order form, signed by Kuroda and dated 7/5/18).]

f.   E`Noa later withdrew its purchase order, and BYD
and E`Noa entered into an Equipment Evaluation and Demonstration
Agreement for two buses instead.  [E. Soderholm Direct at ¶ 33;
Tr. Exh. 12 (agreement, dated 5/1/19).]  E`Noa and BYD did not
disclose this agreement to Erik Soderholm.  [E. Soderholm Direct
at ¶ 33.]

g.   Kuroda testified that E`Noa considered purchasing
or leasing a BYD bus, but the price was too high.  E`Noa
suggested to ANA that ANA purchase or lease the BYD bus for
E`Noa to operate, but ANA was not interested in that idea.
[Kuroda Depo. (Soderholm excerpts) at 22:5-24:1.]

h.   Kuroda hired Arnoldo Albias ("Albias") to look
for other electric vehicles that E`Noa could purchase at a much
lower price than BYD's.  Kuroda believes that, because Scalzi
knew E`Noa was looking into purchasing other electric vehicles,

18

Scalzi suggested to Albias that E`Noa use a demonstration BYD vehicle.  In 2018 or early 2019, BYD ultimately provided E`Noa with two open-style, demonstration buses that displayed the ANA logo.  [Id. at 24:2-14, 25:17-27:20.]

     i.   Kuroda did not involve Erik Soderholm because "[t]here was no exchange of any money" and she "sensed there was no purchase to be made."  [Id. at 26:9-17.]

     j.   Kuroda assumed it was Scalzi's expectation that E`Noa would be so pleased with the demonstration bus that E`Noa would purchase a bus, but Kuroda intended to "tak[e] advantage of BYD" and continue to talk to other electric vehicle manufacturers because BYD's prices were too high.  [Id. at 26:18-27:7.]

     k.   At the time of Kuroda's deposition, E`Noa was still operating BYD's demonstration buses, and Kuroda believed BYD still hoped that E`Noa would make a purchase.  E`Noa was still talking to other manufacturers, and Kuroda did not anticipate buying a BYD vehicle.  Kuroda assumed BYD would ask for the return of the demonstration buses at some point, but she did not know when that would be.  [Id. at 29:2-24.]

     l.   By the time of trial, the demonstration had ended, but "the buses, because of COVID emergency, are still in E Noa's yard."  [Scalzi Direct at ¶ 51.]  There is no evidence

in the record that E`Noa purchased or leased a BYD vehicle after the demonstration period.

m.    The Court finds that BYD never completed a sale to E`Noa.

## C.    **Attempted Termination of the Agreement**

13.    Neshati left his position at BYD in May 2018, [Neshati Depo. (Soderholm excerpts) at 28:6-10,] and BYD's communications with Soderholm diminished.

a.    On August 22, 2018, Erik Soderholm sent an email to Scalzi noting that they had not spoken in "a couple of months[,]" and Erik Soderholm had "[l]eft numerous messages to no avail[.]"  [Tr. Exh. 16.]

b.    In the same email, Erik Soderholm requested current pricing information so that Soderholm could purchase BYD vehicles to sell.  [Id.]  Erik Soderholm never received a response to this email.  [E. Soderholm Direct at ¶ 35.]

c.    In early September 2018, Erik Soderholm attempted to schedule a meeting with BYD's upper management to confirm the relationship between Soderholm and BYD, but no meeting occurred because of the BYD representative's scheduling conflicts.  [Tr. Exh. 36 (email chain between Erik Soderholm and Scalzi from 9/6/18 to 9/12/18); E. Soderholm Direct at ¶ 36.]

14.    When Neshati left BYD, Robert Brian Hill ("Hill") took over Neshati's role in the company, and he became Scalzi's

supervisor at that time.  [Soderholm's Designation of Depo.
Testimony of Robert Brian Hill, filed 12/29/20 (dkt. no. 95),
Exh. 1 (excerpts of trans. of Robert Brian Hill's 11/17/20 Zoom
depo.) ("Hill Depo. (Soderholm excerpts)") at 6:16-22, 7:12-15.]

15.  At some point after Neshati left BYD, Scalzi told Hill
that "there was some sort of an agreement [between] Soderholm
and BYD."  [Id. at 8:21-23.]

a.  Prior to that point, Hill was not aware of the
Agreement.  Hill found the Agreement when he went through some
of Neshati's old files.  [Id. at 8:4-9:1.]

b.  BYD did not have dealer agreements in any other
states, and Hill was surprised to learn about the Agreement.
[Id. at 9:2-7.]

c.  Hill told Stella Li ("Li") and John Zhuang, Esq.
("Zhuang"), about the Agreement when he found out about it.[3]
[Id. at 9:8-10.]  Li told Hill she was not aware of the
Agreement.  [Id. at 9:23-10:2.]

d.  According to Hill, after Zhuang "got involved[,]
. . . from there on it was pretty much in legal's hands."  [Id.
at 10:3-4.]

14.  BYD sent Soderholm a letter, dated September 20, 2018,
stating BYD would end the Agreement, effective October 20, 2018

---

[3] Li is the president of BYD, and Zhuang is BYD's in-house
counsel.  [Hill Depo. (Soderholm excerpts) at 6:25, 20:19-20.]

("9/20/18 Termination Letter").  The 9/20/18 Termination Letter
stated:

> We wish to conclude our relationship because we
> are dissatisfied with Soderholm's performance in
> relation to our sales and service agreement.
> Specifically, we find it unreasonable that
> Soderholm tacks on large margins on top of the
> buses that it is selling in partnership with BYD
> - these margins are commercially unreasonable
> and, in effect, make our buses wholly
> uncompetitive in the Hawaii electric bus market.
> In addition, we have found substantial resistance
> from our customer base to work with Soderholm in
> Hawaii due to past interactions.

[Tr. Exh. 23.]  The letter did not contain any further
information about BYD's reasons for termination.

15.  Soderholm, through counsel, sent BYD a letter, dated
October 2, 2018, responding to the 9/20/18 Termination Letter
("10/2/18 Response Letter").  [Tr. Exh. 24.]

a.  Soderholm reminded BYD that, at the time of the
Agreement's execution, Neshati and Erik Soderholm understood
that it was likely to take three to five years to establish a
market for BYD's electric buses in Hawai`i.  [Id. at 2.]

b.  The 10/2/18 Response Letter listed the efforts
that Soderholm had undertaken to market and sell BYD vehicles,
and the letter asserted BYD had failed to support, and at times
directly worked against, Soderholm's efforts.  [Id. at 2-5.]

c.  Soderholm acknowledged that Article VII of the
Agreement allowed BYD to terminate the Agreement with thirty

days' notice, but Soderholm argued the thirty-day provision was invalid, pursuant to Article IX.J. of the Agreement, because MVILA requires at least sixty days' notice. [Id. at 5 (citing Haw. Rev. Stat. § 437-58(a)).]

d. Soderholm argued the 9/20/18 Termination Letter was also ineffective because: BYD had not provided written notice to the Hawaii Motor Vehicle Industry Licensing Board ("the MVILA Board") that BYD was terminating the Agreement; the termination letter did not sufficiently explain the grounds for termination; and there was no good faith ground to terminate the Agreement. [Id. at 6.]

e. Soderholm stated it had learned that BYD was telling other manufacturers and distributors BYD had terminated its Agreement with Soderholm. Soderholm demanded that that BYD cease making such statements because the 9/20/18 Termination Letter was ineffective. [Id. at 7.] However, Soderholm did not present any evidence at trial regarding BYD's alleged statements. Scalzi denies telling anyone, after the 9/20/18 Termination Letter was issued, that BYD had terminated Soderholm as an authorized BYD dealer. [Scalzi Direct at ¶ 59.]

f. Soderholm asked BYD to "reconsider its attempt to terminate the Agreement in bad faith, and instead work with Soderholm to improve sales by BYD vehicles in Hawaii." [Tr. Exh. 24 (10/2/18 Response Letter) at 7.]

16.   Zhuang acknowledged receipt of the 10/2/18 Response
Letter later that day and promised that BYD would respond "in
the near future."  [Tr. Exh. 24 (10/2/18 email from Mr. Zhuang
to Soderholm's counsel and others).]  A little more than two
weeks later, Mr. Zhuang sent Soderholm's counsel another email,
stating only: "We are rescinding our previously issued notice.
We will reissue a new notice in the near future.  Thank you."
[Id. (email dated 10/18/18 ("10/18/18 Rescission Email")).]

17.   After rescinding the 9/20/18 Termination Letter, BYD
failed to communicate with Soderholm.

   a.   In October and November 2018, Erik Soderholm sent
emails to BYD in an attempt to determine the meaning of 10/18/18
Rescission Email, but BYD did not respond.  [E. Soderholm Direct
at ¶¶ 41-43; Tr. Exhs. 26, 27, 34.]

   b.   On November 26, 2018, he sent another email
asking about the status of the relationship between Soderholm
and BYD and requesting "vehicle specifications and pricing
information for the second Wiki Wiki RFP, . . . pricing for the
County of Hawaii, and . . . manufacturing and delivery
information for E`Noa/ANA," but BYD did not respond.
[E. Soderholm Direct at ¶ 44; Tr. Exh. 28.]

   c.   On December 18, 2018, Gus Soderholm sent BYD an
email asking for information that would aide in a potential sale

24

of a BYD vehicle, but BYD did not respond.  [E. Soderholm Direct at ¶ 45; Tr. Exh. 35.]

      d.   On January 24, 2019, Erik Soderholm sent BYD an email asking why Scalzi did not coordinate his recent visit to Hawai`i with Soderholm, but BYD did not respond.  [E. Soderholm Direct at ¶ 45; Tr. Exh. 35.]

      e.   Scalzi admitted that, even after the 10/18/18 Rescission Email, he avoided communication with Erik Soderholm, and "BYD . . . did not wish to engage in any new sales efforts with [Soderholm] until the concerns regarding the effect on BYD's business and reputation were resolved."  [Scalzi Direct at ¶ 42.]

18.  Soderholm asserts BYD's failure to communicate with Soderholm precluded it from purchasing and reselling BYD vehicles, and, by February 2019, Soderholm determined that BYD was in breach of the Agreement.  [E. Soderholm Direct at ¶ 47.]

19.  Soderholm commenced this action by filing its original Complaint in state court on February 28, 2019.  [Notice of Removal by Defendant BYD Motors Inc., filed 3/29/19 (dkt. no. 1), Exh. 1 (Complaint).]

      a.   According to Erik Soderholm's testimony on cross-examination, Soderholm considered the filing of the Complaint to be its notice to BYD that Soderholm considered the Agreement to be terminated.  [Tr. Trans. at 27.]

b.    However, the Complaint's prayer for relief included a request that BYD be enjoined:

> from (1) **improperly attempting to terminate the Sales and Service Agreement,** (2) acted [sic] in bad faith when attempting to terminate the Sales and Service Agreement, (3) attempting to and consummating sales in Hawaii without using Soderholm as its dealer or using a salesperson who is not properly licensed under the MVILA for the county in which the sales occur, and (4) making material misrepresentations within the industry that BYD terminated its Agreement with Soderholm.

[Complaint at pg. 15, ¶ B (emphasis added).]  The Amended Complaint's prayer for relief includes the same request for injunctive relief.  [Amended Complaint at pg. 21, ¶ B.]

c.    The prayer for relief in both the Complaint and the Amended Complaint indicates that Soderholm considered the Agreement to be in effect and that Soderholm wanted to prevent BYD from terminating the Agreement.

d.    This Court therefore finds that neither the Complaint nor the Amended Complaint constituted written termination notice by Soderholm, under the terms of the Agreement.

20.  There is no evidence that Soderholm made any other attempts to terminate the Agreement, in accordance with Article VII of the Agreement.

21.  BYD sent Soderholm a letter, dated and issued on November 17, 2020, titled "Notice of Termination of Sales and

Service Agreement pursuant to Art. VII.A.2 of the Agreement and HRS § 437-58 Effective January 20, 2021" ("11/17/20 Termination Letter"). [Scalzi Direct at ¶ 43; Tr. Exh. 31.]

      a. The effective date of the 11/17/20 Termination Letter was more than sixty days after the letter was issued; the letter cited specific provisions of the Agreement that BYD believed Soderholm failed to perform; and a copy of the 11/17/20 Termination Letter was sent to the MVILA Board.

      b. The 11/17/20 Termination Letter was not rescinded, and Soderholm has not challenged the 11/17/20 Termination Letter.

22. Because the 9/20/18 Termination Letter was rescinded by BYD and Soderholm never terminated the Agreement, the Agreement remained in effect until January 20, 2021, the effective date of the 11/17/20 Termination Letter.

23. Having considered all of the evidence presented at trial and weighing the witnesses' credibility, this Court finds that, although the Agreement remained in effect until January 20, 2021, BYD made the decision to end its relationship with Soderholm shortly after Neshati left the company. By no later than August 22, 2018, see Tr. Exh. 16, BYD stopped providing Soderholm with the information and resources necessary for Soderholm to sell BYD products.

**D.  Alleged Competition/Interference by Soderholm**

24.  In 2019, the Airports Division issued another RFP for
Wiki Wiki buses.  The 2019 RFP called for either twelve
electric, low-floor, forty-passenger buses or twelve diesel,
low-floor, forty-passenger buses.  [E. Soderholm Direct at
¶ 48.]

   a.  The bids were opened on May 16, 2019.  Soderholm
and Creative Bus Sales each submitted a bid for diesel buses,
and BYD submitted a bid for electric buses.  There were no other
bids, and Soderholm was not the lowest bidder.  [Tr. Exh. 38.]

   b.  The terms of the RFP included that: "Award will
be made to the lowest bid received for BATTERY ELECTRIC BUSES
regardless of any bids received for DIESEL BUSES.  If no bids
are received for BATTERY ELECTRIC BUSES, then award will be made
to the lowest bid received for DIESEL BUSES."  [Tr. Exh. 39 at
SSL001098 (emphasis in original).]

   c.  After the bid opening, Erik Soderholm argued to
Rosemary Neilson-Nenezich, who was with the Airports Division,
that the Creative Bus Sales and BYD bids were nonresponsive
because neither of those two entities had a Hawai`i dealer
license, nor were those bids submitted through licensed dealers.
[E. Soderholm Direct at ¶ 49.]  According to Erik Soderholm,
"[t]he State apparently reached the same opinion" and rejected
Creative Bus Sales's and BYD's bids on the ground that they were

nonresponsive.  Id.; see also Tr. Exh. 52 at 2 (Erik Soderholm states, in an email to Soderholm's counsel about Soderholm's asserted losses, that Soderholm "got BYD thrown out for bidding KM7 direct without a dealer").

    d.   Soderholm was awarded the contract for its diesel bus bid.  [Tr. Exh. 52 at 2.]

    e.   BYD argues Soderholm "won the contract for a BYD's [sic] competitor" and "acted for BYD's competitor and managed to have BYD's bid . . . disqualified."  [Scalzi Direct at ¶¶ 62, 74.]

    f.   Although there is evidence that Erik Soderholm presented arguments to the Airports Division about why BYD's bid should be disqualified, there is no evidence establishing why the Airports Division ultimately disqualified BYD's bid.  Thus, there is no evidence that the Airports Division rejected BYD's bid because of any actions or statements by Erik Soderholm.

    g.   Although Soderholm and BYD both bid in response to the 2019 RFP, they were not direct competitors because Soderholm's bid was for diesel buses, BYD's bid was for electric buses, and the terms of the RFP provided that the lowest responsive bid for electric buses would be awarded the contract, regardless of any bids submitted for diesel buses.

    25.  On January 6, 2020, Erik Soderholm sent an email to Jared Schnader ("Schnader"), asking for "a copy of the Senate

bill that passed Congress that stops U.S. transit agencies from receiving federal funding for Chinese rail & bus builders[.]" [Tr. Exh. 60 at 3.]  The parties have not presented evidence identify what relationship, if any, Schnader has to the parties or the events of this case.

a.    On January 8, 2020, Schnader responded that the bill was signed by the president and became the National Defense Authorization Act.  According to Schnader, the act "gives transit agencies a 2 year grace period to comply.  Meaning that transit agencies can purchase BYD buses for the next two years with Federal Funds."  [Id.]

b.    The same day, Erik Soderholm forwarded Schnader's email to individuals who were with various government entities in Hawai`i.  [Id. at 2.]

c.    On January 14, 2020, one of the individuals forwarded Erik Soderholm's email to Scalzi and stated: "FYI. Please let me know if any of this is true and what impact it would have on BYD."  [Id.]

d.    The record does not contain evidence regarding whether BYD responded to the January 14, 2020 email.

26.  BYD submitted to the City and County of Honolulu, Department of Transportation Services: a bid, dated June 15, 2020, in response to RFP-DTS: 1295305; and a bid, dated June 17, 2020, in response to RFP-DTS: 1362224.  [Tr. Exhs. 73, 74.]

a.   According to Scalzi, BYD lost both bids because of Erik Soderholm's email about the 2019 National Defense Authorization Act.  [Scalzi Direct at ¶ 75.]  Scalzi states "[t]hat email caused major concern about BYD to all Hawaii [public institutions and political subdivisions] at the time." [Id.]

b.   BYD has not presented any evidence supporting Scalzi's speculation that Erik Soderholm's email either caused BYD's June 2020 bids to be rejected or otherwise prevented any government entity in Hawai`i from purchasing or leasing BYD vehicles.

27.  BYD also asserts it lost sales because of Soderholm's actions before BYD attempted to terminate the Agreement in the 9/20/18 Termination Letter.  See Scalzi Direct at ¶ 73; Tr. Exh. 68 (table listing BYD's asserted lost profits).[4]

a.   The attempted sales to TPT/JTB and E`Noa, noted supra, are included among BYD's alleged lost sales.

b.   Based on Don Medeiros's statements to Scalzi, described supra, BYD asserts that, because of Soderholm's involvement, BYD lost the profit that BYD could have obtained

---

[4] Soderholm has objected to Trial Exhibits 68.  Soderholm's objections are overruled because this Court has only considered the exhibits as a summary of BYD's arguments regarding its lost profits.

from the sale of ten K9M buses to the County of Maui. [Tr. Exh. 68.]

c.    BYD asserts the County of Hawai`i bus demonstration went well, but BYD lost the sale because the price that Soderholm quoted to the county was unreasonable. See Tr. Exh. 53 (email exchange about the demonstration); Tr. Exh. 68 (arguing Soderholm quoted a price for two used buses that was greater than BYD's price for new buses).

d.    BYD has not presented any evidence supporting its positions that: the County of Maui would have purchased ten buses from BYD, if Soderholm was not involved; and the County of Hawai`i would have purchased two buses from BYD if it had been offered a lower price.

e.    BYD's position regarding the alleged lost sales to the County of Maui and the County Hawai`i is inconsistent with its arguments that that: it could deal directly with government entities when federal funds were to be used; and, even if it could not deal directly with a government entity, BYD could have engaged another licensed Hawai`i dealer because the Agreement was not exclusive.

**E.    Claims in this Case**

28.    The following claims in Soderholm's Amended Complaint remained at the time of trial: 1) violation of MVILA, based on BYD's attempt to cancel the Agreement ("Count I"); 2) BYD's

conduct related to its attempt to terminate the Agreement constituted bad faith, in violation of Haw. Rev. Stat. § 437-28(a)(21)(C) and § 437-58(g) ("Count II"); 3) BYD's sales efforts that violated the licensing provision of the Agreement also constitute violations of the MVILA ("Count III"); 4) a misrepresentation claim based upon BYD's representation to industry members that BYD has terminated the Agreement ("Count IV"); and 5) a claim for injunctive relief, pursuant to Haw. Rev. Stat. § 437-36 ("Count VI").[5]

29. BYD's Counterclaim asserts the following: breach of contract ("Counterclaim Count I"); interference with prospective contracts ("Counterclaim Count II"); and a claim seeking punitive damages ("Counterclaim Count III").

30. Because Soderholm's Count VI and BYD's Counterclaim Count II address remedies, this Court will not discuss those counts and substantive claims.

---

[5] The other two claims alleged in the Amended Complaint are no longer at issue in this case. See Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Count V of the First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), filed 9/30/19 (dkt. no. 34) (dismiss Count V without prejudice); Minute Order, filed 11/19/19 (dkt. no. 38), at 2 (noting Soderholm did not file a second amended complaint to amend Count V); Stipulation for Dismissal with Prejudice of Count VII for Constructive Trust; Order, filed 1/15/21 (dkt. no. 142).

31.  The parties agree that the amount in controversy in this case exceeds $75,000.  [Counterclaim at ¶ 3; Counterclaim Answer at ¶ 2 (admitting the allegations in Counterclaim ¶ 3).]

## II.  CONCLUSIONS OF LAW

**A.  Jurisdiction** - Because the parties are diverse and the amount in controversy is met, this Court has diversity jurisdiction over the instant action.  See 28 U.S.C. § 1332(a)(1).

## B.  Burden of Proof

1.  Soderholm and BYD have both brought civil claims in this case and, as to each claim, the party seeking relief has the burden to prove the claim and the amount of damages.  See Tourgeman v. Nelson & Kennard, 900 F.3d 1105, 1109 (9th Cir. 2018) ("It is one of the most basic propositions of law . . . that the plaintiff bears the burden of proving his case, including the amount of damages.'" (alteration in Tourgeman) (citation and internal quotation marks omitted)).

2.  There can be different standards of proof depending on the claim asserted:

> The purpose of a standard of proof is "to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."  In re Winship, 397 U.S. 358, 370 (1970) (Harlan, J., concurring).  Three standards of proof are generally recognized, ranging from the "preponderance of the evidence" standard employed

> in most civil cases, to the "clear and
> convincing" standard reserved to protect
> particularly important interests in a limited
> number of civil cases, to the requirement that
> guilt be proved "beyond a reasonable doubt" in a
> criminal prosecution.  <u>See</u> <u>Addington v. Texas</u>,
> 441 U.S. 418, 423-424 (1979).  This Court has, on
> several occasions, held that the "clear and
> convincing" standard or one of its variants is
> the appropriate standard of proof in a particular
> civil case.  <u>See</u> <u>Addington v. Texas</u>, *supra*, at
> 431 (civil commitment); <u>Rosenbloom v. Metromedia,
> Inc.</u>, 403 U.S. 29, 52 (1971) (libel);[6] <u>Woodby v.
> INS</u>, 385 U.S. 276, 285 (1966) (deportation);
> <u>Chaunt v. United States</u>, 364 U.S. 350, 353 (1960)
> (denaturalization).  However, the Court has never
> required the "beyond a reasonable doubt" standard
> to be applied in a civil case.  "This unique
> standard of proof, not prescribed or defined in
> the Constitution, is regarded as a critical part
> of the 'moral force of the criminal law,' <u>In re
> Winship</u>, 397 U.S., at 364, and we should hesitate
> to apply it too broadly or casually in
> noncriminal cases."  <u>Addington v. Texas</u>, *supra*,
> at 428.

<u>Cal. ex rel. Cooper v. Mitchell Bros.' Santa Ana Theater</u>, 454

U.S. 90, 92-93 (1981) (per curiam) (footnote and some citations

omitted).

    3.   "When a district court sits in diversity, . . . the

court applies state substantive law to the state law claims."

<u>Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC</u>, 632 F.3d

1056, 1060 (9th Cir. 2011).  Therefore, Hawai`i law regarding

the applicable burden of proof applies to the parties' claims.

---

    [6] <u>Rosenbloom</u> was overruled on other grounds by <u>Gertz v.
Robert Welch, Inc.</u>, 418 U.S. 323 (1974).

4. "[T]he preponderance of the evidence standard is defined as proof which leads the trier of fact to find that 'the existence of the contested fact is more probable than its nonexistence.'" Luat v. Cacho, 92 Hawai`i 330, 343, 991 P.2d 840, 853 (Ct. App. 1999) (quoting Masaki v. Gen. Motors Corp., 71 Haw. 1, 14, 780 P.2d 566 574 (1989)).

5. "The 'clear and convincing evidence' standard is an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases." Uyeda v. Schermer, 144 Hawai`i 163, 174, 439 P.3d 115, 126 (2019) (citation and some internal quotation marks omitted), *reconsideration denied*, SCWC-16-0000200, 2019 WL 1500014 (Hawai`i Apr. 4, 2019). "It is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable." Iddings v. Mee-Lee, 82 Hawai`i 1, 13, 919 P.2d 263, 275 (1996) (citations omitted).

6. Because no provision of MVILA nor any case law addresses the standard of proof required for MVILA claims, this Court must predict how the Hawai`i Supreme Court would decide the question of what standard of proof applies. See Trishan Air, Inc. v. Fed. Ins. Co., 635 F.3d 422, 427 (9th Cir. 2011); Burlington Ins. Co. v. Oceanic Design & Constr., Inc., 383 F.3d

940, 944 (9th Cir. 2004)).  This Court predicts that the supreme court would hold that the preponderance of the evidence standard applies because that is applicable standard of proof in administrative hearings regarding MVILA disputes.  See Haw. Rev. Stat. § 437-51(d).  This Court will therefore apply the preponderance of the evidence standard to Soderholm's MVILA claims.

7.   The preponderance of the evidence standard also applies to BYD's breach of contract claim.  See Uyeda, 144 Hawai`i at 174, 439 P.3d at 126.

8.   Count IV, Soderholm's misrepresentation claim, is a fraud claim, and the elements of fraud must be proven by clear and convincing evidence.  See Fisher v. Grove Farm Co., 123 Hawai`i 82, 103, 230 P.3d 382, 403 (Ct. App. 2009) (citing Hawaii's Thousand Friends v. Anderson, 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989)).

9.   In addition to fraud claims, Hawai`i courts apply the clear and convincing standard of proof to other claims that are based on based on willful and wonton misconduct.  Iddings, 82 Hawai`i at 14, 919 P.2d at 276.  Because BYD's claim for interference with prospective contracts does not require proof of willful and wanton misconduct, this Court will apply the preponderance of the evidence standard to Counterclaim Count II. See Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel, 113

Hawai`i 251, 268 n.18, 151 P.3d 732, 749 n.18 (2007) (listing the elements of a claim for intentional or tortious interference with prospective business advantage).

10.   Any party's entitlement to punitive damages must be established by clear and convincing evidence.   See Iddings, 82 Hawai`i at 14, 919 P.2d at 276.

## C.   Count I – Soderholm's MVILA Claim Based on the Attempted Cancellation of the Agreement

11.   Count I alleges the 9/20/18 Termination Letter: violated Haw. Rev. Stat. § 437-58(a) because BYD attempted to terminate the Agreement upon only thirty days' notice; and violated Haw. Rev. Stat. § 437-52(3) because BYD lacked good cause to terminate the Agreement.   [Amended Complaint at ¶¶ 18-21.]   The Amended Complaint seeks an order enjoining BYD from improperly terminating the agreement.   [Id. at pg. 21, ¶ B.]

12.   To the extent that Count I sought relief from defects in the 9/20/18 Termination Letter, the claim is moot because the 9/20/18 Termination Letter was rescinded.   See, e.g., Palafox-Lugo v. Lombardo, 768 F. App'x 697, 698 (9th Cir. 2019) ("Because he has already obtained the relief he seeks, his claim is moot." (citing Abdala v. INS, 488 F.3d 1061, 1065 (9th Cir. 2007) (habeas petition moot where petitioner's release and deportation "cur[ed] his complaints" about the length of his detention))).

13.  To the extent that Count I argues Soderholm suffered damages because of BYD's bad faith related to the 9/20/18 Termination Letter, the claim is duplicative of Count II.

14.  Soderholm has therefore failed to carry its burden of proof as to Count I, and BYD is entitled to judgment as to this claim.

## D.  **Count II - MVILA Claim Based on Bad Faith**

15.  Count II alleges BYD engaged in bad faith conduct that violated MVILA, including: issuing the 9/20/18 Termination Letter; and refusing to communicate with Soderholm after it rescinded the 9/20/18 Termination Letter.  [Amended Complaint at ¶¶ 25-27.]

16.  Haw. Rev. Stat. § 437-52(a)(3) states: "A manufacturer or distributor shall not: . . . . Cancel or fail to renew the franchise agreement of any dealer in the State without providing notice, and without good cause and good faith, as provided in section 437-58[.]"

17.  Haw. Rev. Stat. § 437-58(a)-(d) states, in pertinent part:

> (a)  A manufacturer or distributor shall give written notice to the dealer and the board of the manufacturer's intent to terminate, discontinue, cancel, or fail to renew a franchise agreement at least sixty days before the effective date thereof, and state with specificity the grounds being relied upon for such discontinuation,

cancellation, termination, or failure to
renew . . . .[7]

(b)  A dealer who receives notice of intent to
terminate, discontinue, cancel, or fail to renew
may, within the sixty-day notice period, file a
petition in the manner prescribed in section 437-
51 for a determination of whether such action is
taken in good faith and supported by good cause.
The manufacturer or distributor shall have the
burden of proof that such action is taken in good
faith and supported by good cause.

(c)  If the manufacturer's or distributor's
notice of intent to terminate, discontinue,
cancel, or fail to renew is based upon the
dealer's alleged failure to comply with sales or
service performance obligations, the dealer shall
first be provided with notice of the alleged
sales or service deficiencies and afforded at
least one hundred eighty days to correct any
alleged failure before the manufacturer or
distributor may send its notice of intent to
terminate, discontinue, cancel, or fail to renew.
Good cause shall not be deemed to exist if a
dealer substantially complies with the
manufacturer's or distributor's reasonable
performance provisions within the one hundred
eighty-day cure period, or if the failure to
demonstrate substantial compliance was due to
factors that were beyond the control of the
dealer.

(d)  Good cause shall not exist absent a breach
of a material and substantial term of the
franchise agreement.  The existence of one or
more circumstances enumerated in subsection
(a)(1) through (6) above shall be presumed to be
good cause, and the dealer shall have the burden
of proof to show that the action was not taken in
good faith and supported by good cause.

---

[7] Section 437-58(a) identifies exceptions to the sixty-day
requirement, but none of the exceptions apply to the facts of
this case.

18.  MVILA did not impose on BYD any other duty of good faith that is relevant to the instant case.  For example, Haw. Rev. Stat. § 437-28(a)(21)(C) is inapplicable because § 437-28 addresses when the MVILA Board can suspend, revoke, fine, refuse to issue, or refuse to renew a license, and Haw. Rev. Stat. § 437-52(a)(6) is inapplicable because there is no evidence that BYD required Soderholm to construct, renovate, or substantially alter Soderholm's facilities.  To the extent that Soderholm argues BYD engaged in bad faith conduct unrelated to the attempted termination of the Agreement, Soderholm's argument is rejected.

19.  The 9/20/18 Termination Letter stated BYD was terminating the Agreement because it was "dissatisfied with Soderholm's performance."  [Tr. Exh. 23.]  It would have been permissible for BYD to terminate the Agreement for this reason if BYD had complied with the requirements of § 437-58.  See § 437-58(c) ("If the manufacturer's or distributor's notice of intent to terminate, discontinue, cancel, or fail to renew is based upon the dealer's alleged failure to comply with sales or service performance obligations . . . .").

20.  If BYD had provided Soderholm with the required sixty-day-notice prior to termination, Soderholm could have filed a petition for a hearing with the State of Hawai`i Department of Commerce and Consumer Affairs ("DCCA").  See § 437-58(b); Haw.

Rev. Stat. § 437-51(a).  While such a petition and any judicial proceedings initiated seeking review of the resulting decision were pending, the Agreement would have remained in effect.  See § 437-58(e) ("the franchise agreement shall remain in effect until a final judgment is entered after all appeals are exhausted, and during that time the dealer shall retain all rights and remedies pursuant to the franchise agreement, including the right to sell or transfer the franchise").

21.  Based on the parties' correspondence, it was clear that, even after the 10/18/18 Rescission Email, BYD wanted to terminate the Agreement, but there was a dispute between the parties about the details of the termination.  Although there was no DCCA petition pending during the period in question, the principle behind § 437-58(e) applies to the dispute.  The Agreement remained in effect, and Soderholm retained all of its rights thereunder until the dispute was resolved.

22.  Under the Agreement, Soderholm had the right to "buy new BYD Products," [Tr. Exh. 1 at 2, art. I, first ¶ a,] but, beginning August 22, 2018, BYD deprived Soderholm of that right.  However, once Soderholm filed this action, Soderholm stopped attempting to exercise its right to buy BYD products for resale.[8]

---

[8] This Court has included the filing of this action as the last date when Soderholm attempted to exercise its right to buy BYD products, based on Erik Soderholm's testimony.  An earlier
(. . . continued)

23.  This Court therefore concludes that BYD failed "to fully comply with [the Agreement], and to act in a fair and equitable manner towards" Soderholm because BYD deprived Soderholm of Soderholm's rights under the Agreement before their dispute regarding the termination of the Agreement was resolved. See Haw. Rev. Stat. § 437-58(h) ("As used in this section, 'good faith' means the duty of each party to any franchise agreement to fully comply with that agreement, and to act in a fair and equitable manner towards each other.").

24.  Soderholm has carried its burden of proof and established, by a preponderance of the evidence, that BYD failed to act in good faith in relation to its attempt to terminate the Agreement during the period from August 22, 2018 to February 28, 2019.  Soderholm is therefore entitled to judgment as to Count II.

**E.  Count III - MVILA Claim Based on Improper Sales**

25.  Count III alleges BYD engaged in sales in Hawai`i that violated MVILA and that such sales were unfair to Soderholm. The Amended Complaint cites BYD's attempt to negotiate directly with the County of Hawai`i at a price that was lower than what

---

date will be incorporated in this Court's final FOFCOL if BYD, in its supplemental brief, identifies evidence in the trial record establishing an earlier date.

Soderholm could offer to the county and BYD's arrangement with E`Noa. [Amended Complaint at ¶¶ 31-32.]

26. It is not necessary for this Court to decide the issue of whether, and if so under what circumstances, BYD could sell directly to government entities in Hawai`i before it obtained a dealer's license. There is no evidence in the record that BYD completed a sale to the County of Hawai`i, or any other government entity in the State of Hawai`i, during the relevant period.

27. This Court has found that BYD did not complete a sale to E`Noa. Further, there is no evidence in the record that BYD completed a sale to any other private customer in Hawai`i, during the relevant period.

28. To the extent that Soderholm alleges that it suffered damages as a result of BYD's unsuccessful attempts to make sales in Hawai`i without Soderholm, it has only established by a preponderance of the evidence that BYD made such attempts. Soderholm has not proven by a preponderance of the evidence, that it suffered damages that were caused by BYD's attempts.

29. Soderholm has failed to carry its burden of proof as to its claim based on BYD's sales activities that allegedly violated MVILA, and BYD is entitled to judgment as to Count III.

**F.  Count IV - Misrepresentation**

30.  Count IV alleges that, after the 9/20/18 Termination Letter was issued, BYD represented to industry members that it had terminated Soderholm as its dealer.  [Amended Complaint at ¶ 39.]  Further, BYD allegedly continued to make this representation after it rescinded the 9/20/18 Termination Letter.  [Id. at ¶ 41.]  Count IV alleges these were material misrepresentations that caused damage to Soderholm.  [Id. at ¶ 42.]

31.  The elements of an intentional misrepresentation claim are: "(1) false representations were made by defendants; (2) with knowledge of their falsity (or without knowledge of their truth or falsity); (3) in contemplation of plaintiff's reliance upon these false representations; and (4) plaintiff did rely upon them."  Ass'n of Apartment Owners of Newtown Meadows ex rel. its Bd. of Directors v. Venture 15, Inc., 115 Hawai`i 232, 263, 167 P.3d 225, 256 (2007) (brackets, emphasis, and citation omitted).

32.  Because Soderholm has failed to establish these elements by clear and convincing evidence, BYD is entitled to judgment as to Count IV.

**G.  Counterclaim Count I - Breach of Contract**

33.  Counterclaim Count I alleges Soderholm breached the Agreement by, *inter alia*: failing to provide effective sales

performance; failing to build and maintain customer confidence in Soderholm and BYD; offering BYD's vehicles for sale at unreasonable prices; denying BYD of its right to sell directly to public entities; and interfering with BYD's contacts and potential sales. [Counterclaim at ¶¶ 13(a)-(c).]

34. Examples of Soderholm's alleged failure to build and maintain customer confidence include Soderholm's "marketing through bullying of customers" and setting prices so high that it constituted gouging of the customers. [Scalzi Direct at ¶¶ 16, 22; Tr. Exh. 1 (Agreement) at 2, art. I, second ¶ b.]

35. This Court has stated:

> Under Hawai`i law, the elements of a breach of contract claim are (1) the contract at issue; (2) the parties to the contract; (3) whether plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by defendants; and (5) when and how defendants allegedly breached the contract.

RSMCFH, LLC v. FareHarbor Holdings, Inc., 361 F. Supp. 3d 981, 991 (D. Hawai`i 2019) (brackets, citations, and internal quotation marks omitted); see also, e.g., Low v. Honolulu Rapid Transit Co., 50 Haw. 582, 585, 445 P.2d 372, 376 (1968) ("One of the basic elements in proving a breach of a contract of this nature is a showing by the plaintiff either that he has performed the contract or that during the term of the contract he was ready, willing and able to perform." (citations omitted)).

36.   This Court has concluded that BYD deprived Soderholm of Soderholm's right under the Agreement to buy BYD products for resale.   Thus, because BYD could have, but refused to, fully perform under the Agreement, BYD cannot prevail on a breach of contract claim against Soderholm.

37.   Further, even if BYD established that Soderholm breached the Agreement during a period when BYD was fully performing under the Agreement, BYD has not carried its burden to prove that it suffered damages because of the breach.   See Tourgeman, 900 F.3d at 1109.   BYD has not presented any evidence that it would have made sales but for Soderholm's actions.

38.   Because BYD has failed to carry its burden of proof, Soderholm is entitled to judgment as to Counterclaim Count I.

## H.   Counterclaim Count II - Interference with Prospective Contracts

39.   Counterclaim Count II alleges Soderholm "interfer[ed] with BYD's contacts and potential sales to customers, including public entities[.]"   [Counterclaim at ¶ 16.]   Trial Exhibit 68 identifies the prospective contracts that BYD alleges it lost because of Soderholm's actions.

40.   Counterclaim Count II is effectively a claim for tortious interference with prospective business advantage, the claims of which are:

> (1) the existence of a valid business
> relationship or a prospective advantage or

expectancy sufficiently definite, specific, and
capable of acceptance in the sense that there is
a reasonable probability of it maturing into a
future economic benefit to the plaintiff;
(2) knowledge of the relationship, advantage, or
expectancy by the defendant; (3) a purposeful
intent to interfere with the relationship,
advantage, or expectancy; (4) legal causation
between the act of interference and the
impairment of the relationship, advantage, or
expectancy; and (5) actual damages.

Field v. Nat'l Collegiate Athletic Ass'n, 143 Hawai`i 362, 378,

431 P.3d 735, 751 (2018) (emphasis and citation omitted).

41. As to the second Wiki Wiki bid and the two bids in
response to the City and County of Honolulu RFPs, BYD alleges it
lost those prospective contracts because Erik Soderholm
challenged BYD's ability to bid without a licensed dealer, as he
asserted was required by Hawai`i law and because he questioned
whether county funds could be used after 2021 in light of the
National Defense Authorization Act. First, BYD has not
presented evidence that the government entities decided not to
award BYD the contracts because of Erik Soderholm's statements.
Second, the existence and specific provisions of a state or
federal law are facts, and the laws addressed subjects that are
relevant to the industry which Soderholm and BYD are involved
in. Erik Soderholm discussed his **opinions** about the effect of
those laws with people who represented potential customers of
both Soderholm and BYD. These potential customers were
sophisticated parties who could confirm, through their own

independent investigation, whether Erik Soderholm's opinions about the law were reliable.  In fact, one of the customer representatives who Erik Soderholm contacted asked BYD about Erik Soderholm's statements.  <u>See</u> Tr. Exh. 60 at 2.  Moreover, these customers could have investigated the existence and effect of the relevant laws without Erik Soderholm's statements.  This Court therefore concludes that BYD has failed to establish that Erik Soderholm's statements of opinion about the relevant laws were legal causes of BYD's failure to obtain either the 2019 Wiki Wiki contract or the City and County of Honolulu contracts.

42.  As to the other prospective contracts that BYD alleges it lost because of Soderholm's excessive prices or because Erik Soderholm's abrasive style in business negotiations, BYD has also failed to establish causation.  There is no evidence that BYD would have completed the sales at issue without Soderholm's involvement.  For example, although BYD alleges it lost a potential sale of two buses to E`Noa because of the excessive price that Soderholm offered E`Noa, BYD later engaged in direct negotiations with E`Noa, without Soderholm, but BYD never completed a sale because the price that BYD offered was still too high.  BYD has also failed to present sufficient credible evidence that the County of Maui would have purchased BYD vehicles, but the county did not do so because county personnel disliked working with Soderholm.

43.  Because BYD has failed to carry its burden of proof as to any of the prospective contracts it allegedly lost, Soderholm is entitled to judgment as to Counterclaim Count II.

**I.   Remedies**

44.  Soderholm is entitled to damages as to Count II, *i.e.*, actual and statutory damages related to BYD's unsuccessful attempt to terminate the Agreement during the period from August 22, 2018 to February 28, 2019.  Because Soderholm's evidence and argument regarding the amount of the award it is requesting in this case is based on all of Soderholm's claims, Soderholm is ORDERED to file a supplemental brief addressing the amount of the award that would be consistent with this Court's rulings.  Soderholm's supplemental brief must be filed by **July 29, 2021**.  BYD may file a supplemental brief in response by **August 27, 2021**.  The supplemental briefs may not exceed ten pages and may not include any new evidence.  Instead, the parties should only cite evidence already in the trial record.  The Court's ruling regarding the amount of damages will be incorporated in the final FOFCOL.

45.  Soderholm requests "[a] permanent injunction . . . against BYD preventing it from continuing to solicit and offer to sell its motor vehicles in any county within the State of Hawaii in which it does not have a dealer license or is not using a licensed dealer pursuant to the HMVILA."  [Soderholm

Closing Brief at 50.]  This request is denied because this Court concludes that such regulation of BYD's sales activities is reserved to the MVILA Board.  See generally Haw. Rev. Stat. § 437-28.

46.  This Court concludes that Soderholm waives and/or has abandoned all of the other requests for injunctive relief contained in the Amended Complaint.

47.  Insofar as Soderholm has prevailed as to Counterclaim Counts I and II, BYD is not entitled to any of the relief requested in the Counterclaim.

48.  This Court concludes that Soderholm is the prevailing party and is entitled to an award of reasonable attorneys' fees and costs pursuant to Haw. Rev. Stat. § 437-28.5(c).  After the final judgment has been entered, Soderholm shall file a motion for attorneys' fees and costs, in compliance with all applicable court rules, to determine the amount of the award.  The motion will be referred to the magistrate judge and decided in the normal course.  Soderholm's motion for attorneys' fees and costs should attempt to identify the fees and costs attributable to Count II.  This Court makes no findings or conclusions as to the issue of whether other authority supports an award of attorneys' fees and costs incurred in connection with Soderholm's defense against the Counterclaim.

### III. **CONCLUSION**

Soderholm must file its supplemental brief as to the amount of the damages award by **July 29, 2021,** and BYD may file a response by **August 27, 2021.** The supplemental briefs must comply with the requirements set forth above. The Court thereafter will issue its Findings of Fact, Conclusions of Law, Order, and Judgment. The parties are cautioned that they may not use their supplemental briefs regarding damages to seek reconsideration of the Court's rulings set forth in this FOFCOL.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, June 30, 2021.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**SODERHOLM SALES AND LEASING, INC. VS. BYD MOTORS, INC.; CV 19-00160 LEK-KJM; FINDINGS OF FACT AND CONCUSIONS OF LAW**